# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| ROSILES-PEREZ, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:06-CV-0006 |
| | ) | |
| v. | ) | Judge William J. Haynes |
| | ) | Magistrate Judge Juliet Griffin |
| SUPERIOR FORESTRY SERVICE, INC., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | JURY DEMAND |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW ON THEIR
## THIRD MOTION FOR CONTEMPT

### I. INTRODUCTION

1.      This is a class and collective action lawsuit brought by temporary foreign

guestworkers with H-2B visas against Defendant Superior Forestry Services, Inc. and

several of its owners and managers for injunctive relief and back wages pursuant to the

Fair Labor Standards Act, 29 U.S.C. §201 *et seq*, ("FLSA") and the Migrant and

Seasonal Agricultural Worker Protection Act, 29 U.S.C. §1801 *et seq*. ("AWPA"). The

background facts have been described in previous opinions holding Defendants in

contempt of the protective order, (Docket Entry Nos. 167, reported at 2007 U.S. Dist.

LEXIS 8194 (M.D. Tenn. Jan. 31, 2007), and 349); certifying the FLSA collective action

(Docket Entry No. 205); and certifying the class action pursuant to Fed. R. Civ. P. 23 for

the pursuit of Plaintiffs' AWPA claims. (Docket Entry No. 303, reported at 250 F.R.D.

332 (2008)).

1

2.      Before the Court is Plaintiffs' third motion for contempt (Docket Entry No. 387) for Defendants' additional violations of the Court's May 23, 2006 protective order (Docket Entry No. 91) and their interference with the remedies imposed in the Court's prior contempt opinion. (Docket Entry Nos. 349 and 350.)

3.      The Court has twice before held Defendants in contempt of the protective order.  In the last order, entered on September 5, 2008, the Court found that one of Defendants' supervisors had violated the protective order by communicating with putative class members on the merits of this litigation and that Defendants had failed to take necessary action to prevent such violations.  (Docket Entry Nos. 349 and 350.)  The Court also found that Defendants had violated a subsequent directive that they instruct their crew leaders again about the protective order.  Given the history of Defendants' derisive statements about the lawsuit and noncompliance, there was a "strong inference that their clear failure to comply . . . was to threaten workers with adverse job and other consequences if they joined this action." (Docket Entry No. 349, at 13.)

4.      As a remedy, the Court ordered an extension of the opt-in period for putative class members to file their consents to join the FLSA claims and ordered a tolling of the statute of limitations on those claims. The Court also ordered Defendants to pay for broadcast notice, and for the fees and costs associated with class counsel's arranging and conducting meetings with putative class members to provide a balanced view of this action and the rights of the potential class members.  (Docket Entry Nos. 349 and 350.)  The Court also ordered Defendants to pay the fees and costs incurred in litigating the contempt petition.

5.      On December 4, 2009, Plaintiffs filed a renewed motion for a show cause order (Docket Entry No. 387) which the Court granted on February 27, 2009 (Docket Entry No. 430), and on March 20, 2009, the Court held an evidentiary hearing on Defendants' contempt.

6.      The current proceedings arise out of an incident in Mexico involving Manuel Morales, Defendants' recruiter and manager in Mexico.  Morales is also a crew supervisor, and now also a Defendant to this action.  On November 12, 2008, while Plaintiffs' counsel were in Tlaxiaco, Oaxaca attempting to meet with class members and potential class members as ordered by the Court, Morales came to the meeting location and monitored the meeting over several hours.  Plaintiffs submitted evidence that Morales intentionally came to the meeting location after hearing one of the radio announcements that the Court had ordered class counsel to place, and refused to leave even after counsel approached him to tell him that his presence was unwelcome and that this Court would be disturbed to learn that he was interfering with the meeting.  Plaintiffs also submitted evidence showing that Morales fielded a telephone call from a potential class member and talked to him about the case. Plaintiffs contend that this behavior, and the Defendants' failure to take any steps to prevent it, violated the protective order and undermined the sanctions already imposed to remedy the prior instances of contempt. Plaintiffs further contend that the Court has used elevating and lesser sanctions in its previous contempt orders to no avail, and that Defendants' further contempt warrants a partial default judgment.

7.      For the reasons set forth below, the Court finds Defendants in further contempt of its protective orders and will impose additional sanctions, including the entry of a partial default judgment on Plaintiffs' FLSA claims.

## II.  FINDINGS OF FACT

8.      On May 26, 2006, after considering evidence that an SFSI crew leader had engaged in acts of coercion and retaliation against opt-in Plaintiffs, the Court entered a protective order. (Docket Entry No. 91.)  In paragraph 1, the Order barred communications by Defendants, their employees, agents and intermediaries with the Plaintiffs and putative class members about this lawsuit.  (Id., ¶1.)  In paragraph 2, the Order barred acts of intimidation or coercion, providing that:  "Defendants are hereby and immediately prohibited from directing, permitting, or undertaking, either directly or through any employee, agent, or other intermediary, activities that intimidate, threaten, restrain, coerce, or in any manner discriminate against plaintiffs, putative class members, witnesses, potential witnesses, or their family members . . . . "  (Id., ¶2.)

9.      Defendants proceeded to violate the order by failing to instruct employees immediately on its provisions. (Docket Entry No. 168; Docket Entry No. 91, ¶14.) The Court held them in contempt and awarded Plaintiffs their fees and costs on the motion, but reserved additional sanctions. (Docket Entry No. 168.)

10.     On September 5, 2008, the Court held Defendants in contempt again after another crew leader discussed the lawsuit with potential class members in violation of the protective order.  The Court also found that Defendants had violated the Court's clear directive issued from the bench on October 22, 2007, which required them to

immediately instruct supervisors that they were not to speak to class members about the lawsuit. That directive placed Defendants on notice that future violations of the protective order would be dealt with through "an ultimate sanction." (Docket Entry No. 318, Exhibit A, 10/22/2007 Tr. at 58).

11.     In its September 5th opinion holding Defendants in contempt, the Court found that their previous efforts to inform their supervisors of the protective order "were at best half-hearted." (Docket Entry No. 349, at 12.)  In regard to Defendants' memoranda to supervisors, which were relied upon as a defense, the Court found that "[i]n a workforce of employees and agents with limited literacy in English, circulation of a memorandum in English is designed to ensure noncompliance." (Id.)  The Court also found a "strong inference" that the Defendants' clear failure to comply with the October 22, 2007 directive was "to threaten workers with adverse job and other consequences if they joined this action."  (Id. at 13.)

12.     To remedy Defendants' repeated contempt of the Court's orders that were intended to protect class members, the Court tolled the FLSA statute of limitations, kept the opt-in period open, awarded attorney's fees and costs, and ordered corrective notice. (Id. at 13-17.)  For corrective notice, the Court found that direct contact between counsel and putative class members was necessary "to remedy the damage of Defendants' repeated noncompliance and derisive statements about this action." (Id. at 16.)  The Court ordered class counsel to arrange and conduct the meetings, and ordered Defendants to cooperate. (Id. at 16-17.)  Fees and costs were awarded for the litigation of the contempt motion and for arranging and conducting the class member meetings.

5

13.     After the order was entered, Defendants insisted that they had not been able to secure H-2B visas for the 2008-2009 winter planting season due to the governmental limit on the number of such visas.  To plan for corrective notice, Plaintiffs took discovery to determine whether class members and potential class members would be in Mexico or the United States in the fall of 2008.  After determining that the majority of potential class members were likely to be in Mexico, the sanctions order was modified by agreement to provide that counsel would travel to Mexico to conduct the meetings. (Docket Entry Nos. 371-372).

### The Incident in Tlaxiaco, Oaxaca, Mexico on November 12, 2008

14.      On November 8, 2008, one of Plaintiffs' lawyers, Tim Freilich, along with paralegal Viridiana Guido, traveled to Mexico to conduct the meetings ordered by the Court.  They traveled to Oaxaca, where a large concentration of class members and potential class members maintain their permanent residences.  (3/20/09 Tr. at 7-9.)

15.     Before the meetings, counsel placed the broadcast notice ordered by the Court.  (Id. at 9, 47.)  The announcements, run primarily on the radio, publicized the date, time and location of various meetings with counsel. (Id. at 47-48; Pls' Ex. 12.)  Plaintiffs provided Defendants with the text of the radio announcement in October. (Pls' Ex. 12.)

16.     Counsel planned to conduct a large meeting on November 12, 2008 at 10:00 a.m. in the main plaza in the city of Tlaxiaco, Oaxaca.  Approximately 500 class members and potential FLSA opt-in Plaintiffs maintain their permanent residences in and around Tlaxiaco.  (3/20/09 Tr. at 8.)  The area surrounding Tlaxiaco, Oaxaca, Mexico represented the location where the largest concentration of class members and potential class members lived in Oaxaca.  (Id.)

6

17.     Through his videotaped deposition, Manuel Morales testified that he heard the meeting announcement on the radio a day or two before the November 12th meeting. (3/20/09 Tr. at 87.)

18.     Morales, who was added as a Defendant on December 9, 2008, has worked for SFSI for more than fifteen years and has been a crew foreman or supervisor since 1997. (Pls.' Ex. 7 at 24 (Deposition of Manuel Morales taken 4/27/07).)  Since 2002 or 2003, he has worked as SFSI's recruiter in Mexico, running a remote office location out of his home.  (Pls.' Ex. 7 at 40 (Deposition of Manuel Morales taken 4/27/07).)  He testified that he was working as SFSI's recruiter on November 12, 2008. (3/20/09 Tr. at 95.)

19.     As part of his job, Morales registers prospective SFSI employees, provides them with a copy of the general work contract, shows them a video, provides them with a pamphlet about working for SFSI, fills out their visa applications, and notifies them of when they need to travel to Monterrey, Mexico for their visa appointment.  (Pls.' Ex. 7 at 41-45, 73-76 (Deposition of Manuel Morales 4/27/07); Pls.' Ex. 10A (copy of pamphlet provided to prospective employees).) Using his computer and SFSI data files, Morales maintains the lists of the workers who are hired and sends them to his supervisor, SFSI personnel director Hector Santillan.  In referring to the lists in previous testimony, Morales said, "These are my lists. This is the way that I list my people. It's a way that I know how many people I have." (Pls' Ex. 7 at 67:20-68:5). Since at least 2003, essentially all Superior Forestry workers from Oaxaca have been recruited and/or processed only by Morales.  (Pls.' Ex. 7 at 75-76 (Deposition of Manuel Morales 4/27/07).)

20.     Morales also completes the visa applications for approximately six hundred or seven hundred prospective SFSI employees each year.  (Pls.' Ex. 7 at 72 (Deposition of Manuel Morales taken 4/27/07).)  Approximately 90% of those individuals come to his home in Tlaxiaco to process their paperwork.  (Pls.' Ex. 7 at 75-76 (Deposition of Manuel Morales taken 4/27/07).)

21.     Moreover, to secure employment with SFSI, workers recruited by Morales are required to surrender their passport to him and deposit funds for their visas into his personal bank account, which has never been audited by other management. (Pls.' Ex. 7 at 45-50, 73-76 (Deposition of Manuel Morales taken 4/27/07) at 47, 50; 3/20/09 Tr. at 64-65.)

22.     For his work in Mexico, SFSI pays Morales a salary and also pays the electricity bill, telephone, and internet access for his entire household.  (Pls.' Ex. 7 at 58-59 (Deposition of Manuel Morales taken 4/27/07); 3/20/09 Tr. at 89.)  SFSI was paying these expenses in November 2008, when Morales interfered with the meeting in Tlaxiaco. (3/20/09 Tr. at 89, 95.)

23.     Morales testified that when he heard the meeting announcement, he called his supervisor, SFSI personnel director Hector Santillan and informed him of the November 12 meeting in the Tlaxiaco plaza, in either a phone call or voice mail message. (3/20/09 Tr. at 122-23; Pls.' Ex. 15 (stipulations regarding telephone records).)  Santillan admitted that he did nothing to prevent Morales from being there or to remind him of the Court's protective order.  (3/20/09 Tr. at 132.)

24.     A few minutes after 10:00 a.m. on November 12, 2008, named Plaintiff Jesus Santiago-Salmoran noticed that Manuel Morales was walking around the plaza

where the Plaintiffs' meeting was taking place. (3/20/09 Tr. at 67.) Morales then seated himself at the highest point of the plaza at a location overlooking Plaintiffs' counsel's meeting, directly facing Plaintiffs' counsel and the meeting location under the clock tower. (3/20/09 Tr. at 11, 68-69.) Santiago-Salmoran notified Viridiana Guido and then Tim Freilich of Morales's presence. (3/20/09 Tr. at 11, 49-50, 67.)

25.     After being notified of Morales's presence, Freilich shot a photograph of him seated, with arms crossed, under an arcade on the perimeter of the plaza, looking directly down at the meeting location. (3/20/09 Tr. at 12-13, 15-16; Pls.' Ex. 1.) The photograph was taken approximately ten minutes before 11:00 a.m.

26.     Ten or fifteen minutes after shooting the photograph, Freilich approached the location where Morales had been seated and found him talking on his cell phone behind one of the columns of the arcade. Morales had his back to Freilich and did not see him approach. Freilich testified that, when he was a few feet away, he heard Morales say "Don't worry, they haven't even seen me." (3/20/09 Tr. at 18-19.) Morales then turned, and Freilich approached him and said, "I saw you, Manuel." Morales became flustered and immediately hung up the phone. (3/20/09 Tr. at 19.)

27.     Telephone records produced pursuant to the Show Cause order indicate that at the time Freilich approached, Morales was speaking on his cellular telephone with his supervisor, Hector Santillan, SFSI's personnel director based in Arkansas. (Pls.' Ex. 15 at 2 (stipulations regarding telephone records) (showing telephone call from Manuel Morales to Hector Santillan at 11:00 a.m. on 11/12/08); 3/20/09 Tr. at 44-45.)

28.     Freilich identified himself to Morales as counsel for Plaintiffs, handing him a business card. He told Morales that his presence in the plaza was not proper while

Plaintiffs were conducting their meetings and asked Morales to leave the plaza. (3/20/09 Tr. at 19-20.) Morales refused to go, stating, "This is my town, this is my plaza, and no one can tell me I'm not allowed to be here." (3/20/09 Tr. at 20, 22.)

29.     Freilich testified that, while he was standing with Morales under the arcade, Morales received a telephone call. (Id. at 22-23.) It was clear from what Morales said that it was a call from somebody who had heard the radio announcement and was wondering about the meetings being conducted in the plaza. Freilich heard Morales say that the lawsuit had nothing to do with him and that he didn't care if the person attended the meeting or not. He did not tell the caller that he was prohibited from speaking to him about the lawsuit or mention any court order. The conversation lasted several minutes. (Id. at 22.)

30.     At that point, Guzman-Lopez approached Freilich, and the two of them walked back down to the center of the plaza to meet. Only four or five potential class members met with counsel that day.

31.     Although Morales testified that he was only in the vicinity of the plaza for 30-35 minutes on November 12, the evidence clearly established that he actually remained for several hours, well into the afternoon, including a period of time during which he conversed on the phone with Hector Santillan for more than 40 minutes. (Pls.' Ex. 15 (telephone record stipulations showing call beginning at 12:09 p.m. on 11/12/08).) Santiago-Salmoran testified that he saw Morales in the plaza during the entire time of Plaintiffs' meeting, periodically getting up from his seated position under the arcade to walk around, then returning to his seat. (3/20/09 Tr. at 69, 73-74.) Guzman-Lopez confirmed this account of Morales walking around the plaza during the meeting (Pls.' Ex.

5 at 20-21.) Further, a photograph that Freilich took at approximately 1:00 p.m. appears to show Morales standing under the same arcade. (Compare 3/20/09 Tr. at 87-89 with 3/20/09 Tr. at 26-30.) Finally, three of Plaintiffs' witnesses testified that toward the end of their meeting, long after Morales claimed to have left, Morales approached them by the clock tower and told them that he would not attend the meeting scheduled in the plaza for the following day. (3/20/09 Tr. at 24-25 (Freilich), 53 (Guido); 74 (Santiago-Salmoran)).

32.    While Santiago-Salmoran and Guzman-Lopez were not intimidated by Morales, this Court is convinced that his behavior was likely to be intimidating and threatening to many potential class members and even witnesses who may have been interested in speaking to counsel in Tlaxiaco on November 12th. When they saw Morales walking around, Santiago-Salmoran and Guzman-Lopez, who worked for SFSI for many years and are well-acquainted with fellow class members, both concluded that other workers would be intimidated and discouraged from meeting with counsel. (3/20/09 Tr. at 69-70; Pls' Ex. 5, at 20:21-22:12.) Guido and Freilich, who have extensive experience meeting with farmworker clients and traveling in Latin America, were concerned not only for the integrity of their meeting, but also for their personal safety. (3/20/09 Tr. at 19, 36, 50.) Hence, through his activities in violation of the protective order, Morales obstructed a meeting intended to correct the "coercive effects" of Defendants' previous bad behavior and instead multiplied them, sending the message that SFSI management was monitoring workers who met with counsel.

33.    Plaintiffs also proved that Defendants, who were on notice of the Court-ordered meetings, did absolutely nothing to prevent Morales' unacceptable behavior.

Enrique Gonzalez—Superior Forestry's personnel manager and Hector Santillan's supervisor—testified that he knew the September 5, 2008 order (as modified) required the Plaintiffs' lawyers to meet with class members in Mexico. (3/20/09 Tr. at 82.) Yet Mr. Gonzalez took no steps, despite the history in this case of crew supervisors and others under his supervision violating this Court's orders with respect to contact with class members, to ensure that the Court's order was not interfered with, and he took no steps to prevent what Morales did in the plaza in Tlaxiaco. (3/20/09 Tr. at 82-83.) Morales testified that nobody from Superior Forestry ever even informed him of the Court's contempt order, nor that the Plaintiffs' lawyers were to meet with class members in Mexico. (3/20/09 Tr. at 86.)

34. In fact, testimony presented by Santillan, as corroborated by his telephone records, show that Morales was never informed to stay away from Plaintiffs' counsel's meetings until 3:41 p.m. on November 12, 2008, hours after Morales had already interfered. (3/20/09 Tr. at 128-29 ("Q. Did you tell Mr. Morales [to go away from Tlaxiaco]? A. Yes. Q. When? A. In the last conversation I had with him on the 12th."); Pls.' Ex. 15 (telephone record stipulations showing Mr. Santillan's last conversation on November 12, 2008 with Mr. Morales occurred at 3:41 p.m.).)

35. Santillan also testified to the belated steps that he took to inform his other supervisors in Mexico to stay away from any other class member meetings. (3/20/09 Tr. at 129-30.) These steps were taken only after Plaintiffs' lawyers in the United States contacted defense counsel to report Morales's behavior. (See Declaration of Marni Willenson 12-09-2008, Docket Entry No. 388-4).

36.     Over a few hours on November 13 and 14, Santillan reached at least 15 of his crew leaders in Mexico.  Hence, had Defendants wanted to, they could easily have instructed Morales properly before he interfered with the meeting in Tlaxiaco. The inaction is all the more inexcusable given Santillan's frequent contact with Morales in November 2008 (3/20/09 Tr. at 123-24) and the communications between them on November 11 and 12. (3/20/09 Tr. at 122-23, 131-32 ("Q. On November 11th, the day before the meeting, when Mr. Morales communicated with you [Hector Santillan] that he had heard a radio spot and that there was going to be a meeting with Legal Aid, did you contact him to tell him to stay away from that meeting?  A. No.  Q. And did you contact him to remind him of the protective order.  A. No."; Pls.' Ex. 15 (telephone record stipulations showing calls on November 11, 2008 between Mr. Morales and Mr. Santillan).)

**Defendants' Violation of Orders Related to Payment of Fees and Costs**

37.     Since the Order of September 5, 2008, the Defendants have been ordered to pay three separate sets of fees and costs to Plaintiffs' counsel, but they have yet to pay any of them free and clear. The Court has not stayed payment on any of its fee awards.

<u>Fees and costs incurred in litigating Plaintiffs' second contempt motion</u>
<u>(Docket Entry No. 318)</u>

38.     On September 5, 2008, the Court ordered Defendants to pay Plaintiffs' fees and costs incurred in litigating their second contempt motion. (Docket Entry No. 349.)

39.     On September 25, 2008, Plaintiffs' counsel provided Defendants with a letter detailing the fees and costs incurred (Pls.' Ex. 11 (letter of Marni Willenson 9/25/08).) After applying a 15% discount to the fees, offered to avoid a fee dispute, the

total amount due to Plaintiffs was $46,311.66. (Id.)  Defendants did not respond to this letter and simply ignored the Court order that they pay Plaintiffs' fees and costs.

40.     On December 9, 2008, Plaintiffs filed their Show Cause motion to address Morales's conduct.  The motion also sought an order commanding Defendants to pay the $46,311.66 by a date certain. Even after Plaintiffs raised the issue in their show cause motion, Defendants' nonpayment continued.

41.     On February 27, 2009, the Court entered the Show Cause order, repeating its order that Defendants pay the fees and costs incurred litigating the second contempt motion.  It ordered payment of the $46,311.66 by March 9, 2009. (Docket Entry No. 430.)

42.     Defendants have continued to resist the Order by filing motions. On March 5, 2009, Defendants moved to stay the order, and requested permission to deposit the funds with the Court, so that the Court might adjudicate the fees.  (Docket Entry Nos. 436 and 437.)  Despite having been in possession of Plaintiffs' billing records for these costs and fees for more than five months without raising any concerns or objections, Defendants requested in their papers that the Court consider their objections to the hourly rates and time incurred. (Id.)

43.     In a letter to Plaintiffs' counsel dated March 6, 2009, Defendants finally enclosed a check in the amount of the costs and fees ordered to be paid--but encumbered them by requesting that they not be disbursed ("Since Judge Haynes has not yet responded to this motion, we respectfully request that you place these funds in your trust account and not disburse same until a ruling is issued.")  (Defs.' Ex. 5 (letter of Fred Bissinger 3/6/09).)

<u>Fees incurred in securing the February 25, 2009 Show Cause Order</u>

44.     The February 25, 2009 Order required Defendants to pay the fees incurred in securing the Order. In their March 6, 2009 letter, Defendants requested that Plaintiffs also deposit those funds, which approximate $6,700, into a trust account and not disburse them. (Docket Entry No. 430)

<u>Fees and costs incurred providing remedial notice
and conducting meetings in Mexico</u>

45.     In its Order of September 5, 2008, the Court ordered Plaintiffs' counsel to publicize and conduct meetings with class members and putative class members to provide them with information regarding the lawsuit and "correct the coercive effects of the prohibited statements by the Defendants and their agents about this action." (Docket Entry No. 349 at 16.)  This order was amended to provide for substitute corrective notice and meetings in Mexico due to questions regarding Defendants' ability to obtain H-2B visas for workers in the 2008-2009 tree planting season. (Docket Entry No. 372.)

46.     Defendants were ordered to pay the costs associated with radio and television publicity for these meetings, as well as to pay for "the time and expenses of class counsel in arranging and conducting these meetings." (Docket Entry No. 349 at 17.)

47.     On February 20, 2009, Plaintiffs' counsel provided Defendants with a letter setting forth the fees and costs that had been incurred in "arranging and conducting these meetings" in Mexico. (Pls.' Ex. 13 (letter of Marni Willenson 2/20/09).) The Defendants neither paid these fees and costs nor noted any timely objections to them.

48.     The Defendants have been required to pay these fees and costs since September 5, 2008.  Despite receiving a detailed billing on February 20, 2009, the Defendants made no effort to pay them before the March 20, 2009 hearing.

15

49.     On April 7, 2009, Defendants filed a motion to deposit the funds with the Court and asked the Court to adjudicate Plaintiffs' hourly rates and the time incurred. (Docket Entry Nos. 453-454.) The motion also seeks the reversal of the fees awarded in the litigation of the Show Cause order. (Id.)

### III.  PROPOSED CONCLUSIONS OF LAW

50.     "The inherent powers of federal courts are those which 'are necessary to the exercise of all others.'  The most prominent of these is the contempt sanction, 'which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court . . . ."  Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980) (internal citations omitted); see also Shillitani v. United States, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.").  "While the contempt power should not be used lightly, it is 'a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed.'" Southern Elec. Health Fund v. Bedrock Servs., No. 3:02-0309, 2005 U.S. Dist. LEXIS 43999, at *21 (M.D. Tenn. Nov. 18, 2005) (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418 (1911)).

51.     "[A]ll orders and judgments of courts must be complied with promptly," Maness v. Meyers, 419 U.S. 449, 458 (1975), and failure to comply can result in contempt findings.  See Southern Elec., 2005 U.S. Dist. LEXIS 43999, at *21 ("Contempt proceedings are used 'to enforce the message that court orders and judgments are to be complied with in a prompt manner.'" (quoting Gompers, 221 U.S. at 450)).

52.     "In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order." Glover v. Johnson, 934 F.2d 703, 704-707 (6th Cir. 1991) (citing NLRB v. Cincinnati Bronze, Inc., 829 F.2d 585, 590 (6th Cir. 1987)); see also Electrical Workers Pension Trust Fund of Local Union # 58, IBEW v. Gary's Electric Serv. Co., 340 F.3d 373, 379 (6th Cir. 2003) ("IBEW"). Any ambiguities in the order must be resolved in favor of the alleged contemnor. Grace v. Center for Auto Safety, 72 F.3d 1236, 1241 (6th Cir. 1996). The order must be "read in light of the issues and the purpose for which the suit was brought," Cohn v. Kramer, 136 F.2d 293, 295-96 (6th Cir. 1943) (quoting Terminal R.R. Ass'n v. United States, 266 U.S. 17, 29 (1924)), and evidence of noncompliance "must constitute a plain violation of the decree so read." Id.

53.     Good faith is not a defense to civil contempt. Peppers v. Barry, 873 F.2d 967, 969 (6th Cir. 1989); Glover, 934 F.2d at 708 n.2; Fortin v. Commissioner, 692 F.2d 790, 796-97 (1st Cir. 1982); Hauck Manuf. Co. v. Astec Indus., No. 1:03-CV-166, 2004 U.S. Dist. LEXIS 28369, at *4 (E.D. Tenn. Oct. 14, 2004). Faced with evidence of a violation, the respondent may defend with a showing of impossibility. Glover, 934 F.2d at 708 n.2; IBEW, 340 F.3d at 379; Hauck, 2004 U.S. Dist. LEXIS, at *8. The test is whether "'the [respondents] took all reasonable steps within their power to comply with the court's order.'" Glover, 934 F.2d at 708 (quoting Peppers, 873 F.2d at 969).

54.     By its specific terms, the May 23, 2006 Order "extended not only to the Defendants, but also to SFSI's employees and agents." (Docket Entry No. 167 at 7; Docket Entry No. 91 at 1.) The language of Paragraph 1 of the May 23, 2006 Order is

clear and unequivocal in this regard.  (Docket Entry No. 91 at 1.)  Further, as a matter of law,

> a command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs.  If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.

IBEW, 340 F.3d at 380 (quoting Wilson v. United States, 221 U.S. 361 (1911)).

55.     Applying the standards for civil contempt, the Court finds that Plaintiffs have established by clear and convincing evidence that Manuel Morales, acting on behalf of Defendants, violated the May 23, 2006 Protective Order and undermined the September 5, 2008 Contempt Order.  The Court further finds that Defendants failed to take appropriate action to prevent these violations, and more generally, to ensure compliance with the orders of this Court.

### Violations of the May 23, 2006 Protective Order

56.     The evidence is undisputed that Manuel Morales showed up at the time and place of the meeting with class counsel in Tlaxiaco, Oaxaca, placing himself in a position where he could monitor who was there and what went on.  The evidence also clearly showed that Morales watched the meeting, and could be seen watching the meeting.  A photograph taken approximately halfway through the designated meeting time shows him with arms crossed, peering down at the meeting space from a location adjacent to the plaza's main entrance.  Class members and counsel present at the meeting saw him there.

57.     Further, the evidence conclusively established that Morales's presence at the meeting site was willful.  He testified that, about a day before, he heard a radio

announcement and then came to the plaza on November 12th at the designated time. In addition to being unwelcome, his presence in the plaza for several hours that day was far from coincidental.

58. Further, while independent proof of the complicity or culpability of higher-level Superior Forestry management is not required, the record reflects plenty of it. On the stand, Hector Santillan admitted that Morales informed him of the publicized meetings with "Legal Aid." Tim Freilich's credible testimony about Morales's statement, "Don't worry -- they haven't even seen me," in combination with the records of Santillan's cell phone calls convince the Court that Santillan did know that Morales was at the meeting site on November 12th. Nonetheless, Santillan did not order Morales to leave, and so he remained.

59. Moreover, Superior Forestry's highest-ranking personnel manager, Defendant Enrique Gonzalez, admitted that he knew about the Contempt Order and, specifically, that the Court had ordered Plaintiffs' counsel to meet with class members in Mexico. Yet, after the Contempt Order was entered, he did not inform his subordinates of the Order and took no steps to prevent interference with the Court-ordered meetings.

60. Hence, through their actions and inaction, Defendants violated the clear and unequivocal command of ¶ 2 of the May 23, 2006 Order: "Defendants are hereby and immediately prohibited from directing, permitting, or undertaking, either directly or through any employee, agent or intermediary, activities that intimidate, threaten, restrain, coerce, or in any manner discriminate against plaintiffs, putative class members, witnesses, potential witnesses, or their family members[.]" (Docket Entry. No. 91 ¶ 2.) This command prohibits *any* explicit or implicit threat directed at Plaintiffs, putative class

members, or witnesses, or potential witnesses—all of whom may have been present, or may have intended to be present, at the meetings ordered by the Court.

61.    The Court finds that Manuel Morales's presence in the Tlaxiaco plaza while Plaintiffs' legal representatives were attempting to conduct a Court-ordered meeting with class members and potential class members violated the May 23, 2006 Order.  The coercive nature of Morales's presence is self-evident and undeniable.  Given the undisputed facts related to (*inter alia*) his power to determine which workers are placed on Defendants' hiring list, the economic vulnerability of the members of the Plaintiff class, the seasonal nature of their employment and limitations of their work visas,  it strains credulity to suggest that Manuel Morales's presence in the plaza was benign.

62.    Moreover, Morales was observed and photographed in a threatening posture, looking out at the meeting site, and was also observed walking about the plaza talking on his cell phone.  He was also seen in the area over the course of several hours, but in his testimony, he described no business that he needed to conduct apart from going to the bank for ten or fifteen minutes.  The Court finds that this lingering about and other behavior was very likely to deter any class members, potential class members, or witnesses with an interest in continued employment at Superior Forestry from meeting with Plaintiffs' counsel.

63.    The Court further notes that such fears would hardly reflect paranoia. Rather, the concerns expressed by Plaintiffs Santiago-Salmoran and Guzman-Lopez about who was on the other end of Morales's phone calls were well-warranted.  At the

plaza that day, Morales engaged in two telephone conversations with Superior Forestry's personnel director, one of which went on for 42 minutes.

64. Next, the Court finds clear and convincing evidence that Morales also violated ¶ 1 of the May 23, 2006 Order, which bars all communications with Plaintiffs and potential class members about the lawsuit. In his testimony, Freilich described how Morales fielded a telephone call on his cell phone and made statements about the lawsuit, confirming that there was a meeting in the plaza with a lawyer, representing that the lawsuit had "nothing to do" with him, and professing indifference. He did not state that he was prohibited from speaking to the caller about the lawsuit or direct him to speak to his lawyer. This testimony was uncontradicted.

65. Morales's statements violated the May 23, 2006 Order, which bars any communications by Defendants and their agents about this lawsuit. His statement that the lawsuit has "nothing to do" with him and his professed indifference misrepresent the record. In fact, this lawsuit has much to do with Morales and his activities as Superior Forestry's recruiter and manager in Mexico. He has also been named as Defendant. Hence, these improper statements join the litany of Defendants' misstatements and misrepresentations about this lawsuit, before and after entry of the Court's May 23 Order.

66. The Court has reiterated the prohibitions of the Protective Order repeatedly in these proceedings, in the starkest terms. The only permissible statement that Defendants, their managers, or other agents may make about this lawsuit to persons protected by the May 23, 2006 Order is that they are barred by Court order from saying

anything.  They may also refer individuals to Plaintiffs' counsel, or to meetings with

them.  Any other comment contravenes the May 23, 2006 Order.[1]

### Interference with the Court's Contempt Order Remedies

67.    The events in Tlaxiaco, Oaxaca are even more egregious when considered

in the context of these ongoing contempt proceedings.  This Court ordered Plaintiffs'

counsel to meet with class members to remedy the damage from Defendants' repeated

noncompliance with its Orders and derisive statements about this action.  (Docket Entry

No. 349 at 16.)  The fact that Morales was not informed of the Court's September 5, 2008

Order is inexcusable.  Having been sanctioned for failing to act reasonably to prevent

their managers from violating the protective order, Defendants then proceeded *to do*

*nothing* to prevent interference with the remedies imposed.  Their inaction continued

even after being placed on notice of the particular meetings to be held in Tlaxiaco.  The

Court previously found that Defendants' efforts to inform their supervisors of the

protective order amounted to willful noncompliance. (Docket Entry No. 349 at 12.)  This

finding was followed by further inaction and even tacit approval of Morales' behavior,

exposing class members to the likelihood of further harm.

### Nonpayment of Fees and Costs Awarded

68.    The record reflects that Defendants also violated the September 5, 2008

Order by failing to promptly pay the attorney's fees and costs awarded by the Court.

(Docket Entry No. 349 at 17; Docket Entry No. 350-1.)  Class counsel's September 25,

2008, correspondence setting forth Plaintiffs' fees and costs incurred in the contempt

proceedings was met with complete silence.  The letter identified each attorney's hourly

---

[1] Defendants may also distribute the written orders of this Court, in English or
Spanish.

rate in the local market and was accompanied by detailed time records. Defendants had ample opportunity to raise objections to the fees and costs incurred but failed to do so. For nearly six months, Defendants ignored the order to pay the fees and costs, and then paid them only after the Court's Show Cause order mandated their payment again. There was no excuse for this protracted contempt of the September 5, 2008 Order.

69.     Defendants were also ordered to pay the costs of the broadcast notice and the time and expenses of class counsel in arranging and conducting the meetings in Mexico. (Docket Entry No. 349 at 17; Docket Entry No. 350-1.) On February 20, 2009, class counsel sent correspondence and billing records reflecting the fees and costs incurred. Defendants have still paid none of the fees and costs incurred carrying out the Court's remedial order.

### Sanctions for Contempt

70.     Sanctions for civil contempt are imposed "to compel obedience to a court order and compensate for injuries caused by noncompliance.'" Redken Laboratories, Inc. v. Levin, 843 F.2d 226, 229 (6th Cir. 1988) (quoting TWM Mfg. Co., Inc. v. Dura Corp., 722 F.2d 1261, 1273 (6th Cir. 1983)). "The contemnor is not simply being punished for past behavior, but rather encouraged to shape its behavior to comply with the order based on the undesirability of suffering the sanction." United States v. Tennessee, 925 F. Supp. 1292, 1303 (W.D. Tenn. 1995).

71.     The selection of an appropriate sanction requires a "common sense consideration of competing concerns: avoidance of punitive sanctions and selection of a sanction to "'coerce the contemnor to comply.'" MGE UPS Sys. v. Titan Specialized Servs., Inc., No. 3:04-0231, 2006 U.S. Dist. LEXIS 88398 (M.D. Tenn. Dec. 6, 2006)

(quoting United States v. Tennessee, 925 F. Supp. at 1303); see also Qantam Comms. Corp. v. Star Broadcasting, Inc., 473 F.Supp.2d 1249 (S.D. Fla. 2007) (court must "balance the interest in sufficiently punishing and deterring the abusive conduct with the interest of allowing a full trial on the merits.").

72.     In appropriate circumstances, courts have the power to employ the "ultimate" sanctions of dismissal and default.  See NHL v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976) (default under Rule 37); Link v. Wabash R.R. Co., 370 U.S. 626 (1962) (dismissal); Regional Refuse Sys., Inc. v. Inland Reclamation Co., 842 F.2d 150 (6th Cir. 1988) (dismissal); Weiss v. Winner's Circle, No. 91 C 2780, 1995 U.S. Dist. LEXIS 18919 (N.D. Ill. Dec. 15, 1995) (default); Telectron, Inc. v. Overhead Door Corp., 116 F.R.D. 107 (S.D. Fla. 1987) (default).  These harshest sanctions should be employed sparingly, after lesser sanctions have been considered and rejected.  Weiss, 1995 U.S. Dist. LEXIS 18919 at *20; but see NHL, 427 U.S. at 643 (most severe sanction must be available as a penalty and deterrent); Regional Refuse, 842 F.2d at 155 (ultimate sanction may be appropriate, even if lesser sanctions "might be workable"). Ultimately, the type and severity of sanctions imposed is within the sound discretion of the Court.  See NHL, 427 U.S. at 642; Regional Refuse, 842 F.2d at 154; Peppers, 873 F.2d at 968.

73.     In determining an appropriate sanction, the Court is not limited to considering only the specific violation involved, and may consider everything that has occurred in the litigation.  See Regional Refuse, 842 F.2d at 150; Weiss, 1995 U.S. Dist. LEXIS 18919 at *24 (recommending default based on finding of "consistent and pervasive pattern of contumacious conduct").

74.     Here, this Court has entered two previous orders imposing elevating sanctions for noncompliance with the May 23, 2006 Order.  The last Order imposed significant sanctions which included equitable tolling of the FLSA statute of limitations, an additional period for the acceptance of FLSA consent forms, corrective notice, and an award of substantial attorney's fees and costs.  Defendants' response to that Order was continued inaction and further contempt.  Despite the Court's specific findings on the inadequacy of previous efforts to ensure compliance with the May 23, 2006 Order (Docket Entry No. 349, at 12), Defendants took no new steps to avert further harm.  They did not communicate to their managers that the company had been held in contempt or issue more effective instructions on the protective order.  They did not instruct management in Mexico to stay away from the Court-ordered meetings with class members.  As a consequence, Superior Forestry's highest-ranking manager in Mexico disrupted the principal meeting and obstructed the corrective notice process.  So far as the Court can tell, no Superior Forestry manager has ever been disciplined for making derisive statements about the lawsuit or for violating the Orders that have been entered by this Court to protect class members from harm and to ensure the integrity of this class and collective action and the judicial process.

75.     As a defense, Defendants relied again on the memorandum, written in English, whose circulation the Court previously found was "designed to ensure noncompliance." (Docket Entry No. 349 at 12.)  Plainly, Defendants are not taking account of this Court's findings or heeding its repeated warnings that further noncompliance would lead to the harshest of sanctions.

76. Hence, after careful consideration of the entirety of the record before it, this Court concludes that the appropriate sanction for Defendants' additional violations of the May 23 Order and interference with the contempt order remedies is a partial default judgment. See Weiss, 1995 U.S. Dist. LEXIS 18919 (recommending default judgment for, *inter alia*, failure to obey court order barring communications with class members about the lawsuit); Qantam Comms., 473 F. Supp. 2d at 1277. By now, it is abundantly clear that no lesser sanction has any prospect of encouraging Defendants' compliance with the Court's orders entered to protect the integrity of the class and collective action and the judicial process.

77. Moreover, at this juncture, only a partial default has any prospect of curing the severe prejudice that has been inflicted on the prosecution of this class and collective action from Defendants' unremedied derisive statements about the lawsuit and continuing contempt of Court. As a result of Morales' conduct, and the reckless behavior of higher-level management in allowing it to occur, the harm that the Court intended to remedy in its last order has continued unabated. As set forth in its earlier Order, that harm is severe. The class consists of up to several thousand economically vulnerable guestworkers who have no knowledge of their legal rights or the judicial process in federal District Court. This case has now been pending for three years, with the proceedings persistently delayed by Defendants' obstreperous conduct and repeated contempt.[2] As time passes, class members will perceive the likelihood of any recovery in this lawsuit to be more and more

---

[2] Although not a consideration in the imposition of contempt sanctions, the Court notes its impression that Defendants have exploited their discharge of trial counsel for purposes of delay. The lawyers were fired and new counsel appeared on the day that settlement conference statements were due to the magistrate. New counsel then sought an indefinite continuance of a settlement conference that Defendants had asked the Court to order.

remote.  Faced with severe economic hardship and few opportunities in Mexico, class members who believe that they must choose between a job in the United States now and some remote chance of a future recovery will feel intense pressure to forego the pursuit of their legal claims.  Cf. Wang v. Chinese Daily News, 236 F.R.D. 485, 489 (C.D. Cal. 2006) ("when weighing threats to job security against speculative economic recovery, many employees might choose to opt out for fear of their jobs rather than making an independent choice").  The record strongly suggests that Defendants are banking on low class member participation rates rather than raising a legitimate defense on the merits. Cf. Hammond Packing Co. v. Arkansas, 212 U.S. 322 (1909) (affirming use of default under state antitrust statute where "one may reasonably infer from the suppression of relevant evidence that the defendant's case is lacking in merit").  Given the culpability of Manuel Morales, Hector Santillan and Enrique Gonzalez in the violations, the Court deems it particularly appropriate that Plaintiffs seek a default judgment on their claims arising from their forced payment of pre-employment expenses, as these claims relate directly to the activities of Morales, as Superior Forestry's recruiter in Mexico, and his superiors.[3]

78.    The Court therefore strikes the defenses and enters a partial default judgment on Plaintiffs' claims (in Count II of the Second Amended Complaint) arising from Defendants' failure to reimburse their pre-employment visa, transportation and

---

[3] Although such affirmative proof is not necessary to support a default judgment, the Court notes that there would be ample evidence in the record to support factual findings in Plaintiffs' favor. (See Docket Entry Nos. 380-1, Deposition of Enrique Gonzalez, 5/10/2007 (Excerpts); 380-2, Deposition of William Ioup (Excerpts); Deposition of  Manuel Morales, 4/30/2007, through 380-6); 380-5, Deposition of Hector Santillan, 5/102007 (Excerpts); Deposition of Manuel Morales-Martinez, 4/26/2007 (Excerpts)).

recruitment costs and the resulting minimum wage and overtime violations.  See Arriaga v. Florida Pacific Farms, LLC, 305 F.3d 1228 (11th Cir. 2002); Marshall v. Root's Restaurant, 667 F.2d 559 (6th Cir. 1982); De Leon-Granados v. Eller & Sons Trees Inc., 581 F. Supp. 2d 1295 (N.D. Ga. 2008); Rosales v. Hispanic Employee Leasing Program, 2008 U.S. Dist. LEXIS 9756 (W.D. Mich. Feb. 11, 2008); Rivera v. Brickman Group, 2008 U.S. Dist. LEXIS 1167, 13 Wage & Hour Cas. 2d (BNA) 275 (E.D. Pa. Jan. 7, 2008); Recinos-Recinos v.Express Forestry Inc., 2006 U.S. Dist. LEXIS 2510 (E.D. La. Jan. 24, 2006).  The Court finds Defendants liable to Plaintiffs in the amount of their unpaid minimum and overtime wages plus an equal amount of liquidated damages.  See 29 U.S.C. § 216(b).  The applicable statute of limitations is the three-year period for willful violations of the Fair Labor Standards Act.  See 29 U.S.C. § 255.

79.     The default judgment will apply to all Plaintiffs who have already filed a FLSA consent- to-sue form or who file a consent-to-sue form within forty-five days after the entry of this Order.  A prove-up on damages will be held on _____, 2009 [enter date approximately 60 days after entry of the Order] at _____a.m./p.m.

80.     For notice, the Court orders Defendants to circulate to all current non-supervisory H-2B employees the Court-approved FLSA notice and opt-in form, in Spanish and English, using the payroll distribution system described by Haley Tester in her hearing testimony. The Court-approved notice shall be appended to a letter from class counsel setting forth in plain language the claims that are the subject of the default judgment, the right of potential FLSA class members to participate in the recovery and in the ongoing FLSA claims, the deadline for the submission of opt-in forms, and contact

information for counsel. Each letter shall be accompanied by a postage-paid envelope for the return of opt-in forms to class counsel, for subsequent filing with the Court. As the parties at fault, Defendants are responsible for the costs of notice. Veliz v. Cintas Corp., No. C 03-1180 SBA, 2004 U.S. Dist. LEXIS 24871 (N.D. Cal. Nov. 12, 2004); Belt v. Emcare, 299 F. Supp. 2d 664 (E.D. Tex. 2003); Bullock v. Automobile Club, No. SA CV 01-731-GLT(ANx), 2002 U.S. Dist. LEXIS 7692 (C.D. Cal. Jan. 28, 2002); Ralph Oldsmobile, Inc. v. GMC, No. 99 Civ. 4567 (AGS), 2001 U.S. Dist. LEXIS 13893 (S.D.N.Y. Sep. 7, 2001); In re Federal Skywalk Cases, No. 81-0945-A-CV-W-S, 1982 U.S. Dist. LEXIS 10116 (W.D. Mo. Nov. 16, 1982).

81.     Defendants shall takes all necessary steps to ensure that their supervisory employees refrain from any prohibited communications or activities that might deter class members from participating in the default judgment and the ongoing FLSA claims. Before notice is distributed, Defendants shall instruct their crew leaders, verbally and in writing, in their native language, that any communications with non-supervisory H-2B employees about this lawsuit or interference with the Court-ordered remedies will lead to further sanctions, including default.

82.     For notice to potential FLSA claimants in Mexico, the Court orders Defendants to pay the costs of broadcast notice in the six largest radio markets where potential FLSA Plaintiffs reside, as determined by data available to class counsel. Class counsel are responsible for the text of the radio ads, for placing broadcast notice, and for facilitating the receipt of opt-in forms from potential class members in Mexico.

83.     The Court's equitable tolling order suspending the statute of limitations on the FLSA claims shall continue in effect, and shall remain in effect through the time of a

final judgment on the class-wide FLSA claims. (Docket Entry No. 349 at 13-15.) Likewise, for reasons articulated previously, and in light of Defendants' additional violations, the period for the acceptance of FLSA consent-to-sue forms shall remain open through the time of judgment. (Id. at 13-16.) Section § 16(b) of the FLSA incorporates no deadline for the filing of consent-to-sue forms. See 29 U.S.C. § 216(b); Melendez-Cintron v. Hershey Puerto Rico, 363 F. Supp. 2d 10 (D.P.R. 2005). Here, the Court finds that enforcing a pre-judgment filing deadline, when there has been repeated, willful interference with the FLSA collective action, including the undermining of the Court's previous remedial order, would be inequitable and undermine the purposes of § 16(b) of the FLSA. See Brooklyn Savings v. O'Neil, 324 U.S. 697 (1945) (noting that the purpose of FLSA is to "aid the unprotected, unorganized and lowest paid of the nation's working population"). If a judgment of liability is entered in Plaintiffs' favor, as a matter of law, or after trial, a procedure will be adopted for further notice to potential FLSA plaintiffs and an opportunity to participate in the relief ordered.

84. The Court also awards Plaintiffs their reasonable attorney's fees and costs incurred in connection with their contempt motion, after the issuance of the Show Cause order.[4] See McMahon & Co. v. Po Folks, Inc., 206 F.3d 627, 634 (6th Cir. 2000) ("[A]n award of attorney's fees appropriate for civil contempt situations where court orders have been violated."); Redken Lab., 843 F.2d at 226.

85. As should be clear from previous Orders, this Court does not intend its remedial orders awarding fees and costs to turn into side litigation on attorney's fees. Absent a contention that specific time entries are either grossly in excess of time

---

[4] Fees and costs incurred in securing the Show Cause Order were already awarded.

reasonably devoted to a particular task or unrelated to the litigation of Plaintiffs'

contempt motion, Defendants shall make payment within ten days of their receipt of a

statement of the fees and costs incurred, using the hourly rates applied in the calculation

of the attorney's fees awarded in the Show Cause order.

### Unsupported Accusations Against Attorney Freilich

86.     Finally, the Court notes with extreme disapproval Defendants' use of

groundless and inflammatory accusations against counsel in an effort to deflect attention

from their own bad behavior.

87.     After the substitution of defense counsel, Plaintiffs informed the new

defense lawyers of the events in Mexico. After promising to investigate, they sent a letter

saying that they had concluded that Manuel Morales had not done anything wrong and

accusing Tim Freilich of misconduct. (See Docket Entry No. 388-4.) They proceeded to

lodge these very serious accusations against Mr. Freilich in their pleading filed in

response to the show cause motion, even seeking to exploit them to argue for a

modification of the protective order. (Docket Entry No. 400, at 3.) Defendants' pleading

was not supported by any actual evidence of misconduct by Mr. Freilich. Instead, they

offered the plainly inadmissible affidavit of Hector Santillan, as both witness and

interpreter to an alleged telephone conversation between one of Defendants' lawyers and

Manuel Morales. (Docket Entry No. 400-1.)  Subsequently, at his videotaped deposition,

Defendants did not even attempt to elicit any testimony from Morales to support the

allegations.  In fact, no evidence of any misconduct by Mr. Freilich was ever presented

and he was fully exonerated.

88.     The Court is disturbed that Defendants would accuse Mr. Freilich of highly unethical behavior in the absence of proof, and then, when provided with an additional opportunity to elicit such proof, decline to do so.  At the very least, Defendants should have formally withdrawn their accusations against Freilich if they intended to provide no admissible evidence of any wrongdoing.

89.     Defendants' conduct in lodging spurious allegations against counsel prolonged these proceedings, requiring the introduction of evidence vindicating Mr. Freilich.  Although the Court refrains from the consideration of sanctions against the Defendants pursuant to 28 U.S.C. §1927 for vexatious and bad faith conduct, these are the sort of facts that would warrant sanctions for abuse of process.

### IV.  CONCLUSION

90.     For the reasons described above, the Court finds Defendants in additional contempt of the May 23, 2006 protective order.  The Court's equitable tolling order shall continue in effect.  The period for class members to file their FLSA consent-to-sue forms is extended through the entry of a liability finding on the claims in Count II of the Second Amended Complaint.  A partial default judgment is entered against Defendants on the claims in Count II which arise from their failure to reimburse Plaintiffs for their pre-employment visa, transportation and recruitment fees.  This partial default judgment shall apply to all Plaintiffs who have previously filed a consent-to-sue form and to potential class members who file a consent-to-sue form within 45 days of the entry of this Order.  Defendants are ordered to provide further notice of the FLSA collective action and of the entry of this partial default, as set forth above, and shall take all necessary steps to ensure that their supervisory employees refrain from any prohibited communications or activities

32

that might deter class members from participating in the default judgment and the

ongoing FLSA claims. The Court awards Plaintiffs their reasonable attorney's fees and

costs incurred in litigating their contempt motion, after the issuance of the Show Cause

order.

Respectfully submitted,

/s/Marni Willenson
Marni Willenson
Illinois Bar Number 6238365
*Pro Hac Vice*
Farmworker Justice
4064 North Lincoln Ave., #359
Chicago, IL 60618
(312) 546-4137
(312) 261-9977 (fax)

Andrew Turner
Virginia Bar Number 48853
*Pro Hac Vice*
Immigrant Justice Project
Southern Poverty Law Center
400 Washington Avenue
Montgomery, Alabama 36104
(334) 956-8200
(334) 956-8481 (fax)

Mary C. Bauer
Virginia Bar Number 31388
*Pro Hac Vice*
James M. Knoepp
Virginia Bar Number 46327
*Pro Hac Vice*
Kristi L. Graunke
Georgia Bar Number 305653
*Pro Hac Vice*
Immigrant Justice Project
Southern Poverty Law Center
233 Peachtree Street, Suite 2150
Atlanta, GA 30303
(404) 521-6700
(404) 221-5857 (fax)

Joshua Karsh
Illinois Bar Number 6203096
*Pro Hac Vice*
Hughes Socol Piers Resnick & Dym, Ltd.
70 West Madison Suite 4000
Chicago, IL 60602-4692
(312) 580-0100
(312) 580-1994 (fax)

Tim A. Freilich
Virginia Bar Number 44077
*Pro Hac Vice*
Erin Trodden
Virginia Bar Number 71515
*Pro Hac Vice*
Legal Aid Justice Center
1000 Preston Avenue, Suite A
Charlottesville, VA  22903
(434) 977-0553
(434) 977-0558 (fax)

Richard L. Tennent
Tennessee PBR No. 16931
Bank of America Plaza
414 Union Street, Suite 904
Nashville, TN  37219
(615) 244-1110
(615) 244-1114 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing was served by the Court's electronic filing system (CM/ECF) on counsel named below:

Frederick J. Bissinger
Wimberly, Lawson, Seale, Wright & Davies, PLLC
200 4<u>th</u> Avenue N., Suite 900
Nashville, TN 37219

T. Harold Pinkley
Kara E. Shea
Miller & Martin, PLLC
Suite 1200, One Nashville Place
150 Fourth Avenue North
Nashville, TN 37219

Ana L. Escobar
Escobar & Parks, PLLC
Bank of America Plaza, Suite 905
414 Union Street
Nashville, TN 37219

this 7th day of April, 2009.

/s/Marni Willenson
Marni Willenson
Attorney for Plaintiffs