# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

ROSLIES-PEREZ, et al.,          )
                                )
    Plaintiffs,          )     NO. 1:06-00006
                                )     JUDGE HAYNES
v.                              )
                                )
SUPERIOR FORESTRY SERVICE, INC., )
et al.,                         )
                                )
    Defendants.          )

## M E M O R A N D U M

Plaintiffs, temporary foreign guestworkers with H-2B visas, filed this action as a

collective action against the Defendants: Superior Forestry Services, Inc. and several of its

owners and managers seeking injunctive relief and back wages under the Fair Labor Standards

Act, 29 U.S.C. § 201 et seq. ("FLSA") and the Migrant and Seasonal Agricultural Worker

Protection Act, 29 U.S.C. §1801 et seq. ("AWPA"). The Court certified this action as a

collective action under the FLSA (Docket Entry No. 205) and under Fed. R. Civ. P. 23(b)(3) on

Plaintiffs' AWPA claims. (Docket Entry No. 303).

As pertinent here, in prior rulings, the Court twice held the Defendants in contempt for

their repeated violations of the May 23, 2006 Protective Order (Docket Entry No. 91) in this

action. (Docket Entry Nos. 168 and 350). In its September 5, 2008 ruling, the Court first found

that one of Defendants' supervisors had violated the May 23rd protective order by

communicating with putative class members on the merits of this litigation and that Defendants

had failed to take necessary action to prevent such violations. (Docket Entry Nos. 167 and 168).

The Court also found that Defendants had violated a subsequent Court directive that the

Defendants' agents instruct their crew leaders again about the May 23rd protective order. Given the history of Defendants' derisive statements about this action and their clear noncompliance, the Court found a "strong inference that their clear failure to comply . . . was to threaten workers with adverse job and other consequences if they joined this action." (Docket Entry No. 349, at p. 13). As a remedy, the Court ordered an extension of the opt-in period for putative class members to file their consents to join the FLSA claims and tolled the statute of limitations on those claims for that purpose. The Court also ordered Defendants to pay for a broadcast notice of class counsel's meeting with potential class members in Mexico, as well as fees and costs associated with class counsel's arranging and conducting meetings with putative class members. This meeting was to provide putative class members a balanced view of this action and to inform potential class members of their rights under the FLSA and AWPA. The Court also ordered Defendants to pay Plaintiffs' fees and costs incurred in litigating the contempt petition.

Before the Court is Plaintiffs' third motion for contempt (Docket Entry No. 387) for Defendants' additional violations of the Court's May 23rd protective order and their interference with the remedies imposed in the Court's prior contempt orders. (Docket Entry Nos. 349 and 350). Plaintiffs' third contempt motion arises out of an incident at the Mexico meeting involving Manuel Morales, Defendants' recruiter and supervisor in Mexico. Morales is also named Defendant in this action. In sum, Plaintiffs contend that on November 12, 2008, while Plaintiffs' counsel were in Tlaxiaco, Mexico to meet with class members and potential class members, as ordered by the Court, Morales came to the meeting location and monitored Plaintiffs' counsel's meetings over several hours. Plaintiffs submitted evidence that Morales intentionally went to the designated meeting location after hearing one of the radio announcements of the meeting's time

2

and place. After Plaintiffs' counsel approached Morales to tell him that his presence was unwelcomed and that he could face a contempt petition for violation of the Court's Order, Morales refused to leave. According to Plaintiffs, Morales fielded a telephone call from a potential class member and talked to him about this action. Plaintiffs contend that Morales's behavior, and Morales's supervisor's failure to take any steps to prevent his conduct at that meeting, violate the May 23rd protective order and undermined the Court's remedy to cure Defendants' contempt. Plaintiffs further contend that Defendants' prior collective conduct warrants a partial default judgment on the merits.

In response, Defendants assert that Plaintiffs' third motion is based upon speculation and unreasonable inferences from ambiguous facts. Defendants insist that they were unaware of the specific time and place of the meeting of Plaintiffs' counsel with putative class members.

For the reasons set forth below, the Court again finds Morales and Hector Santillan, his supervisor and the Defendants' manager, engaged in contumacious conduct in violation of the May 23rd protective order by Morales's intimidating presence at Plaintiffs' counsel's meeting that Santillan failed to prevent. In the Court's view, the appropriate sanction is to preclude the Defendants from offering proof on the amount of Plaintiffs' damages because the Defendants' continuing contumacious conduct has been designed to lower their financial exposure, if the Defendants were held liable on the merits of Plaintiffs' claims.

## A. FINDINGS OF FACT

### 1. Defendants' Prior Contumacious Acts

Paragraph 1 of the May 23rd Order barred communications by Defendants, their employees, agents and intermediaries with the Plaintiffs and putative class members about this

3

lawsuit. (Docket Entry No. 91 at ¶ 1). This Order was based upon proof that an SFSI crew leader had engaged in acts of coercion and retaliation against opt-in-Plaintiffs. Given the Plaintiffs' and putative class members' limited education, economic resources and language limitations, the Order also barred acts of future intimidation or coercion. The Order provided that: "Defendants are hereby and immediately prohibited from directing, permitting, or undertaking, either directly or through any employee, agent, or other intermediary, activities that intimidate, threaten, restrain, coerce, or in any manner discriminate against plaintiffs, putative class members, witnesses, potential witnesses, or their family members . . . ." Id. at ¶ 2. The Defendants first violated the order by failing to instruct employees immediately on its provisions. (Docket Entry No. 91, 114 and Docket Entry No. 168).

On September 5, 2008, the Court held Defendants in contempt again after another crew leader discussed this action with potential class members in violation of the May 23rd protective order. The Court also found that Defendants had violated the Court's clear October 22, 2007 directive issued from the bench, requiring the Defendants to instruct their supervisors immediately that they were not to speak to class members about this action. That directive placed Defendants on notice that future violations of the protective order would involve a harsher sanction. (Docket Entry No. 318, Exhibit A, October 22, 2007 Transcript at 58). In its September 5th ruling, the Court found that the Defendants' prior efforts to inform their supervisors of the protective order "were at best half-hearted." (Docket Entry No. 349, Memorandum at p. 12). As a defense, Defendants relied upon a memorandum that was in English. The Court found that memorandum in English was inadequate "[i]n a workforce of employees and agents with limited literacy in English," and that "circulation of a memorandum

4

in English is designed to ensure noncompliance." Id. The Court also found a "strong inference" that the Defendants' clear failure to comply with the October 22, 2007 directive would allow workers "to be threatened with adverse job and other consequences if they joined this action." Id. at p. 13.

To remedy this repeated contempt, the Court tolled the FLSA statute of limitations, kept the opt-in period open, awarded attorney's fees and costs, and ordered corrective notice. Id. at pp. 13-17. For corrective notice, the Court found that direct contact between Plaintiffs' counsel and putative class members was necessary "to remedy the damage of Defendants' repeated noncompliance and derisive statements about this action." Id. at p. 16. The Court ordered class counsel to arrange and conduct the meetings, and ordered Defendants to cooperate. Id. at pp. 16-17. Fees and costs were awarded for the litigation of the contempt motion and for arranging and conducting the class member meetings.

To plan for the corrective notice, Plaintiffs took discovery to determine where class members and potential class members would be in Mexico or the United States in the fall of 2008. After determining that the majority of potential class members were likely to be in Tlaxiaco, Mexico, the order was modified by agreement to provide that Plaintiffs' counsel would travel to Mexico to conduct the meetings with class members. (Docket Entry Nos. 371-372).

### The November 12, 2008 Incident

On November 8, 2008, Tim Freilich, one of Plaintiffs' lawyers and Viridiana Guido, a paralegal traveled to Tlaxiaco, Mexico to conduct the meetings ordered by the Court. Approximately 500 class members and potential FLSA opt-in Plaintiffs maintain their permanent residences in and around Tlaxiaco. Before the meetings, Plaintiff's counsel caused publication of

5

the broadcast notice ordered by the Court. The announcements were run primarily on the radio and publicized the date, time and location of the meeting with Plaintiffs' counsel. (Plaintiffs' Exhibit No. 5, at p. 24-25). Plaintiffs provided Defendants with the text of the radio announcement in October, 2008. Freilich planned to conduct a large meeting on November 12, 2008 at 10:00 a.m. in the main plaza in Tlaxiaco, Mexico.

Manuel Morales heard the meeting announcement on the radio in Mexico a day or two before the November 12th meeting. Morales, who has been named a defendant since December 9, 2008, has worked for SFSI for more than fifteen years and has been a crew foreman or supervisor since 1997. (Plaintiffs' Exhibit 7 at p. 24). Since 2002 or 2003, Morales has worked as SFSI's recruiter in Mexico, running an office out of his home. (Plaintiffs' Exhibit No. 7, Morales Deposition, at p. 40). Morales was working as SFSI's recruiter on November 12, 2008. Among his job duties, Morales registers prospective SFSI employees, provides them with a copy of the general work contract, shows them a video, provides them with a pamphlet about working for SFSI, completes their visa applications, and notifies them of when they need to travel to Monterrey, Mexico for their visa appointment. Plaintiffs' Exhibit 10A.

Morales has a computer for his SFSI data files and maintains the lists of the workers who are hired and sends them to Hector Santillan, his supervisor and SFSI's personnel director. Morales testified: "These are my lists. This is the way that I list my people. It's a way that I know how many people I have." (Plaintiffs' Exhibit No. 7, Morales Deposition at pp. 67-68). Since at least 2003, essentially all SFSI workers have been recruited and/or processed only by Morales. Id. at pp. 75-76. Each year, Morales completed visa applications for approximately six hundred or seven hundred prospective SFSI employees. Approximately 90% of those persons

6

come to Morales's home in Tlaxiaco to process their paperwork. For employment with SFSI, recruits must surrender their passports to Morales and deposit funds for their visas into his personal bank account that has never been audited by SFSI management. For his work in Mexico, SFSI pays Morales a salary, his electric bill, telephone, and internet access. SFSI paid these expenses at the time of November 12, 2008 meeting of Plaintiffs' counsel and class members in Tlaxiaco.

According to Morales, after he heard the announcement of the actual meeting and its date, he contacted Santillan, his supervisor, and SFSI's personnel director to inform him of the November 12th meeting date and the site, the Tlaxiaco plaza. Morales did so by either a telephone call or by voice mail message. See Plaintiffs' Exhibit 15 (stipulations regarding telephone records)). Santillan admitted that he did nothing to prevent Morales from attending the meeting nor did Santillan remind him of the Court's Protective Order.

A few minutes after 10:00 a.m. on November 12, 2008, Jesus Santiago-Salmoran, a named Plaintiff, noticed that Morales was walking around the plaza, the site of the Plaintiffs' meeting. Morales seated himself at the highest point of the plaza overlooking Plaintiffs' counsel's meeting and was directly facing Plaintiffs' counsel who was meeting under the plaza's clock tower. Santiago-Salmoran notified Freilich and Guido of Morales's presence. Freilich then shot a photograph of Morales seated, with arms crossed, under an arcade on the perimeter of the plaza, looking directly down at the meeting location. Plaintiffs' Exhibit 1. The photograph was taken approximately ten minutes before 11:00 a.m.

Ten or fifteen minutes after taking this photograph, Freilich approached the location where Morales had been seated and found him talking on his cell telephone behind one of the

7

columns of the arcade. Morales had his back to Freilich and did not see him approach. According to Freilich, when he was within a few feet, he overheard Morales state: "Don't worry, they haven't even seen me." (March 20, 2009 Transcript, at pp 18-19). Defendants' telephone records reflect that about the time Freilich approached, Morales was speaking on his cellular telephone with Santillan, his supervisor, SFSI's personnel director who was in Arkansas. Plaintiffs' Exhibit 15 at p. 2 and March 20, 2009 Transcript at pp. 44-45. Morales then turned, and Freilich approached him and said, "I saw you, Manuel." At that point, Morales became flustered and immediately hung up the phone. Id. at p. 19.

Freilich identified himself to Morales as counsel for Plaintiffs, and gave Morales his business card. Freilich told Morales that his presence in the plaza during his meetings with workers was improper and asked Morales to leave the plaza. Id. at pp. 19-20. Morales refused, stating, "This is my town, this is my plaza, and no one can tell me I'm not allowed to be here." Id. at pp. 20, 22.

While Freilich was standing with Morales under the arcade, Morales received a telephone call. Id. at pp. 22-23. During this call, Freilich overheard Morales respond that the subject of the conversation had nothing to do with him and that he did not care if the person attended the meeting or not. Morales did not tell the caller that he was prohibited from speaking to him about the lawsuit or mention any court order. Freilich contends and the Court agrees from the nature of Morales's statement and conduct, that under the circumstances, the caller was likely a putative class member. The conversation lasted several minutes. Id. at p. 22. At that point, Guzman-Lopez approached Freilich, and the two of them returned to the center of the plaza to meet. Of the 500 potential class members, only four or five met with Plaintiffs' counsel that day.

8

Although Morales insists that he was only in the vicinity of the plaza for 30-35 minutes on November 12th, the Court finds that Morales actually remained for several hours, well into the afternoon. Santiago-Salmoran testified that he saw Morales in the plaza during the entire time of Plaintiffs' counsel's meeting, periodically getting up from his seated position under the arcade to walk around and then returned to his seat. See also Plaintiffs' Exhibit 7, Morales Deposition at pp. 20-21. Another photograph that Freilich took at approximately 1:00 p.m. appears to show Morales standing under the same arcade. During this time period, Morales's telephone records reflect that his conversation with Santillan lasted for more than 40 minutes. Plaintiffs' Exhibit 15 (telephone record stipulations showing call beginning at 12:09 p.m. on November 12, 2008)). Finally, three of Plaintiffs' witnesses testified that toward the end of their meeting, long after Morales purportedly left, Morales approached them by the clock tower and told Freilich, Guido and Santiago-Salmoran that he would not attend the meeting scheduled in the plaza for the next day.

Although Santiago-Salmoran and Guzman-Lopez were not intimidated by Morales, Freilich expressed concerns for his personal safety. The Court finds that in light of the Court's prior Orders and the history of this action, Morales lacked any legitimate reason to be present in the area of the Plaintiffs' counsel's meeting. The Plaintiffs' counsel meeting with putative class members was ordered by the Court. Absent any legitimate justification for Morales's presence, the Court deems Morales's behavior to be a clear effort to intimidate and threaten potential class members and witnesses who may have been interested in speaking to Plaintiffs' counsel in Tlaxiaco on November 12th. Santiago-Salmoran and Guzman-Lopez, who worked for SFSI for many years and know class members, opined that with Morales's presence, other workers would

9

be intimidated and discouraged from meeting with Plaintiffs' counsel. Plaintiffs' Exhibit 5 at pp. 20-22). Guido and Freilich, who have extensive experiences meeting with farmworker clients and traveling in Latin America, were concerned about the integrity of their meeting and for their personal safety. (March 20, 2009 Transcript at pp. 19, 36, 50).

The Court also finds that Morales obstructed this meeting that the Court set to correct the prior "coercive effects" of Defendants' previous agents' contumacious behavior. With Santillan's consent, Morales remained at the meeting area despite his disruptive presence. Morales's continued presence, in effect, conveyed a message that SFSI management was monitoring any worker who met with Plaintiffs' counsel. Santillan, Defendants' personnel director, had actual notice of the Court ordered meetings, and Morales's presence of the actual meeting time and place, but Santillan did not take any measures to prevent Morales' unacceptable presence at that meeting. Santillan's testimony and his telephone records reflect that Morales was never informed to stay away from Plaintiffs' counsel's meetings until 3:41 p.m. on November 12, 2008, hours after Morales's initial interference. (March 20, 2009 Transcript at pp. 128-29 ("Q. Did you tell Mr. Morales [to go away from their [Tlaxiaco]? A. Yes. Q. When? A. In the last conversation I had with him on the 12th). Santillan's telephone record and the parties' stipulations establish Santillan's last conversation with Morales on November 12, 2008 occurred at 3:41 p.m. Plaintiffs' Exhibit 15. Santillan did not inform Morales's or other supervisors in Mexico to stay away from these class member meetings.[1] Such steps were taken only after

_____

[1]("Q. On November 11[th], the day before the meeting, when Mr. Morales communicated with you [Hector Santillan] that he had heard a radio spot and that there was going to be a meeting with Legal Aid, did you contact him to tell him to stay away from that meeting? A. No. Q. And did you contact him to remind him of the protective order. A. No." (March 20, 2009 Transcript at pp. 131-32; Plaintiffs.' Exhibit No. 15 (telephone record stipulations showing calls

10

Plaintiffs' lawyers in the United States contacted defense counsel to report Morales's behavior. (Docket Entry No. 388-4, Willenson Declaration). Then with few hours on November 13 and 14, Santillan reached at least 15 of his crew leaders in Mexico. Clearly, the Defendants had the capacity to instruct Morales and others after the Court's Order setting the meeting and before the meeting, not to interfere with any meeting of Plaintiffs' counsel and putative class members.

Enrique Gonzalez, SFSI's personnel manager and Santillan's supervisor, testified that he also was aware of the September 5, 2008 order requiring the Plaintiffs' lawyers to meet with class members in Mexico. (March 20, 2009 Transcript at p. 82). Yet, despite SPSI's history of its crew supervisors and others under his supervision violating this Court's orders not to contact class members, Gonzalez also did not take any remedial steps to prevent a recurrence. Morales testified that none of SFSI's personnel informed him of the Court's contempt order nor that the Plaintiffs' lawyers were to meet with class members in Mexico.

### 3. Court's Orders on Attorney Fees

In the September 5, 2008 Order, the Court ordered the Defendants to pay three separate sets of fees and costs to Plaintiffs' counsel incurred in litigating their contempt motions. (Docket Entry No. 349). On September 25, 2008, Plaintiffs' counsel provided Defendants with a letter detailing the fees and costs incurred (Plaintiffs' Exhibit 11 (letter of Mami Willenson 9/25/08)). After applying a 15% discount to the fees, so as to avoid a fee dispute, Plaintiffs' counsel submitted a bill of $46,311.66. Id. Defendants did not respond to this letter nor pay Plaintiffs' fees and costs. The Defendants did not seek a stay of that Order nor did the Court issue any stay.

On December 9, 2008, in their Show Cause motion on Morales's conduct, Plaintiff again

---

on November 11, 2008 between Mr. Morales and Mr. Santillan)).

11

sought an order commanding Defendants to pay the $46,311.66 by a date certain. Even after Plaintiffs raised the issue in their show cause motion, Defendants' nonpayment continued. On February 27, 2009, the Court entered the Show Cause order, repeating its order that Defendants pay the Plaintiffs' attorneys' fees and costs incurred litigating the second contempt motion. The Court ordered payment of the $46,311.66 by March 9, 2009. (Docket Entry No. 430). Defendants did not comply with the Order.

On March 5, 2009, Defendants moved to stay the order, and requested permission to deposit the funds with the Court, so that the Court might adjudicate Defendants' objections to the fees. (Docket Entry Nos. 436 and 437). The motion to stay was not granted. Despite their possession of Plaintiffs' billing records for these costs and fees for more than five months, Defendants first requested that the Court consider their objections to the hourly rates and time incurred. Id. Given the passage of time, the Court overruled these objections and found any objections to Plaintiffs' reduced fee to be waived.

In a letter to Plaintiffs' counsel dated March 6, 2009, Defendants finally enclosed a check for attorney fees and costs, but told the Plaintiffs' counsel that "[s]ince Judge Haynes has not yet responded to this motion, we respectfully request that you place these funds in your trust account and not disburse same until a ruling is issued.") (Defendants' Exhibit 5, Bissinger letter 3/6/09)). In a separate Order, the Court denied the Defendants' motion objecting to fees that the Court earlier found to be reasonable. (Docket Entry No. 464).

The Court also ordered the Defendants to pay these costs associated with radio and television publicity for the meetings of Plaintiffs' counsel and putative class members, as well as to pay for "the time and expenses of class counsel in arranging and conducting these meetings."

12

(Docket Entry No. 349 at 17.)   On February 20, 2009, Plaintiffs' counsel provided Defendants with a letter setting forth the fees and costs that had been incurred in "arranging and conducting these meetings'" in Mexico. (Plaintiffs' Exhibit No. 13 (letter of Mami Willenson 2/20/09)).  The Defendants neither paid these fees and costs nor filed any timely objections to them.  The Defendants have been required to pay these fees and costs since September 5, 2008.  Despite receiving a detailed billing on February 20, 2009, the Defendants did not pay these fees and costs before the March 20, 2009 hearing.  On April 7, 2009, Defendants filed a motion to deposit the funds with the Court and again requested the Court decide the reasonableness of Plaintiffs' hourly rates and the time incurred.  (Docket Entry Nos. 453 & 454).  The Court denied that motion.  (Docket Entry No. 481).

## B.  CONCLUSIONS OF LAW

"The inherent powers of federal courts are those which 'are necessary to the exercise of all others.'  The most prominent of these is the contempt sanction, 'which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court . . . ." Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980) (internal citations omitted); Shillitani v. United States, 384 U.S. 364, 370 (1966) ("There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt.").  "While the contempt power should not be used lightly, it is 'a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed.'" Southern Elec. Health Fund v. Bedrock Serv., No. 3:02-0309, 2005 U.S. Dist. LEXIS 43999, at *21 (M.D. Tenn. Nov. 18, 2005) (quoting Gomvers v. Bucks Stove &Range Co., 221 U.S. 418 (1911)).

13

"[A]ll orders and judgments of courts must be complied with promptly," <u>Maness v. Meyers</u>, 419 U.S. 449,458 (1975), and failure to comply can result in contempt findings. <u>Southern Elec.</u>, 2005 U.S. Dist. LEXIS 43999, at *21 ("Contempt proceedings are used 'to enforce the message that court orders and judgments are to be complied with in a prompt manner.'") (quoting <u>Gomvers</u>, 221 U.S. at 450)).

"In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order." <u>Glover v. Johnson</u>, 934 F.2d 703,704-707 (6th Cir. 1991) (citing <u>NLRB v. Cincinnati Bronze. Inc.</u>, 829 F.2d 585,590 (6th Cir. 1987)). <u>See also Electrical Workers Pension Trust Fund of Local Union # 58, IBEW v. Gary's Electric Sew. Co.</u>, 340 F.3d 373,379 (6th Cir. 2003) ("IBEW"). Any ambiguities in the order must be resolved in favor of the alleged contemnor. <u>Grace v. Center for Auto Safety</u>, 72 F.3d 1236, 1241 (6th Cir. 1996). The order must be "read in light of the issues and the purpose for which the suit was brought," <u>Cohn v. Kramer</u>, 136 F.2d 293,295-96 (6th Cir. 1943) (quoting <u>Terminal R.R. Ass'n v, United States</u>, 266 U.S. 17,29 (1924)), and evidence of noncompliance "must constitute a plain violation of the decree so read." <u>Id.</u>

Good faith is not a defense to civil contempt. <u>Peppers v. Barry</u>, 873 F.2d 967, 969 (6th Cir. 1989). Upon proof of a violation, the respondent may defend with a showing of impossibility. IBEW, 340 F.3d at 379; <u>Glover</u>, 93 4 F.2d at 708 n.2. The test is whether "'the [respondents] took all reasonable steps within their power to comply with the court's order." <u>Id.</u> at 708 (quoting <u>Peppers</u>, 873 F.2d at 969). "Substantial compliance" is not a defense to a contempt motion. <u>Maness</u>, 419 U.S. at 458. Under <u>Peppers</u>, "the defendants [must take] all reasonable steps within their power to comply with the court's order," 873 F.2d at 969. Here, the

14

Defendants' efforts to inform their supervisors of the protective order, and the Court's additional warnings, were again non-existent or at best half-hearted. The record reflects that Defendants earlier circulated a memorandum in a language that most of its employees and agents cannot read.

By express terms, the May 23, 2006 Order "extended not only to the Defendants, but also to SFSI's employees and agents." (Docket Entry No. 167 at 7; Docket Entry No. 91 at 1). The language of Paragraph 1 of the May 23, 2006 Order is clear and unequivocal in this regard. (Docket Entry No. 91 at 1.) Further, as a matter of law,

> a command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.

IBEW , 340 F.3d at 380 (quoting Wilson v. United States, 221 U.S. 361 (1911)).

### The November 12th Violations of the Protective Order

After previously discussing the November 12th meeting with Santillan, his supervisor prior to the actual meeting, Morales clearly was present at the time and place of the meeting with class counsel in Tlaxiaco, Oaxaca with the consent of his supervisor. Morales placed himself in a position where he could monitor who met with class counsel and what occurred. Class members and counsel at the meeting saw Morales there. A photograph that was taken approximately halfway through the designated meeting time, shows Morales with arms crossed, looking down at the meeting space from a location adjacent to the plaza's main entrance. The Court finds that Morales's lingering and other behavior thereafter, was highly likely to deter any class members, potential class members, or witnesses with an interest in continued employment

15

at Superior Forestry from meeting with Plaintiffs' counsel. The Court adopts the opinion of Plaintiffs Santiago-Salmoran and Guzman-Lopez on the effects of Morales's presence overlooking these meetings. Morales is a named Defendant and is Superior Forestry's key recruiter and manager in Mexico. Given Morales's power to determine which workers are placed on Defendants' hiring list, the economic vulnerability of the members of the Plaintiffs' class, the seasonal nature of their employment and limitations of their work visas, the Court finds that Morales's presence in the plaza was intimidating to putative class members.

The Court concludes that Morales's presence at the meeting site lacked a legitimate business reason[2] and given the Defendants' managers' supervisors' and agents prior contumacious acts, the Court finds that Morales's presence was to interfere with the Court's Order. Santillan's admission that Morales informed him of the publicized meetings with "Legal Aid" and Santillan's cell telephone record clearly establish Santillan's knowledge of Morales's presence at the meeting site on November 12th and Santillan's failure to order Morales to leave until hours later. Moreover, Gonzalez, Superior Forestry's highest-ranking personnel manager, admitted that his knowledge of the Court's Order that the Court ordered Plaintiffs' counsel to meet with class members in Mexico. Yet, Gonzalez did not inform his subordinates of the Order and did not take any steps to prevent Morales's interference with the Court-ordered meetings.

The Court concludes that the Defendants violated the clear and unequivocal command of ¶ 2 of the May 23, 2006 Order: "Defendants are hereby and immediately prohibited from directing, permitting, or undertaking, either directly or through any employee, agent or

---

[2]In his testimony, Morales described his presence at the plaza as the need to conduct his bank business that would take ten or fifteen minutes.

16

intermediary, activities that intimidate, threaten, restrain, coerce, or in any manner discriminate against plaintiffs, putative class members, witnesses, potential witnesses, or their family members[.]" (Docket Entry. No. 91 ¶ 2). This command prohibits any explicit or implicit threat directed at Plaintiffs, putative class members, or witnesses, or potential witnesses-all of whom may have been present, or may have intended to be present, at the meetings ordered by the Court.

Applying these standards, the Court finds that Plaintiffs have established by clear and convincing evidence that Morales and Santillan, acting as Defendants' supervisors and agents, violated the May 23, 2006 Protective Order and undermined the September 5, 2008 Contempt Order. The Court further finds that Defendants' manager, particularly Gonzalez, failed to take appropriate remedial action to prevent these violations and to ensure compliance with the Orders of this Court.

In a FLSA collective action, the statute of limitations continues to run for each Plaintiff until her or she files written consent to join the action. 29 U.S.C. § 256(b); Baden-Winterwood v. Life Time Fitness, 484 F.Supp.2d 822, 826 (S.D. Ohio 2007). Yet, this statute "establishes only a procedural limitations period." Ott v. Midland Ross, 523 F.2d 1367, 1370 (6th Cir. 1975), that is subject to equitable tolling, waiver and estoppel. Id. accord E.E.O.C v. Kentucky State Police Dep't., 80 F.3d 1086, 1095 (6th Cir. 1996) (the doctrine of equitable tolling is read into every federal statute). The equitable tolling doctrine "permits courts to extend the statute of limitations on a case-by-cases basis to prevent inequity." Baden-Winterwood, 484 F.Supp.2d at 826 (citing Truitt v. Country of Wayne, 148 F.3d 644, 648 (6th Cir. 1998)).

The Sixth Circuit lists five factors to consider on equitable tolling: (1) whether the plaintiffs lack actual notice of their rights and obligations; (2) whether they lacked constructive

17

notice; (3) the diligence with which they pursued their rights; (4) whether the defendant would be prejudiced if the statute were tolled; and (5) the reasonableness of the plaintiffs remaining ignorant of their rights. Kentucky State Police, 80 F.3d at 1094 ; Baden-Winterwood, 484 F.Supp.2d at 826-27 (equitably tolling FLSA statute of limitations). This list is neither exclusive nor mandatory. Dixon v. Gonzalez, 481 F.3d 324, 331 (6th Cir. 2007); see Hasken, 234 F.Supp.2d at 692 (list not "comprehensive"). Equitable tolling has been found where three of the five factors were not satisfied. See Dixon, 481 F.3d at 331. The Court considers all five factors and again finds a sufficient showing to toll the limitations period for putative class members claims under the FLSA and the AWPA.

### Nonpayment of Fees and Costs Awarded

Defendants also violated the September 5, 2008 Order by their continued failure to pay promptly the attorney's fees and costs approved and ordered the Court. (Docket Entry No. 349 at p. 17; Docket Entry No. 350 at p. 1). Defendants did not respond to Class counsel's September 25, 2008, correspondence setting forth Plaintiffs' fees and costs incurred in the contempt proceedings. This letter set forth each attorney's hourly rate at the local market rates and was accompanied by detailed time records. Defendants had ample opportunity to raise objections to the fees and costs incurred but failed to do so. For nearly six months, Defendants ignored the Court's orders to pay the fees and costs, and then paid them only after the Court's Show Cause order mandated their payment again. Defendants were also ordered to pay the costs of the broadcast notice and the time and expenses of class counsel in arranging and conducting the meetings in Mexico. (Docket Entry No. 349 at 17; Docket Entry No. 350-1). On February 20, 2009, class counsel sent correspondence and billing records reflecting the fees and costs incurred.

18

Yet, Defendants delayed payment of the fees and costs incurred implementing the Court's remedial order until after March 2009 show cause hearing.

### Sanctions for Contempt

Sanctions for civil contempt are imposed "to compel obedience to a court order and compensate for injuries caused by noncompliance." Redken Laboratories. Inc. v. Levin, 843 F.2d 226, 229 (6th Cir. 1988) (quoting TWM Mfg. Co., Inc. v. Dura Corn., 722 F.2d 1261, 1273 (6th Cir. 1983)). "The contemnor is not simply being punished for past behavior, but rather encouraged to shape its behavior to comply with the order based on the undesirability of suffering the sanction." United States v. Tennessee, 925 F. Supp. 1292,1303 (W.D. Tenn. 1995).

Selection of an appropriate sanction requires a "common sense consideration of competing concerns: avoidance of punitive sanctions and selection of a sanction to 'coerce the contemnor to comply.'" MGE UPS Sys. v. Titan Specialized Servs., Inc., No. 3:04-0231, 2006 (M.D. Tenn. Dec. 6, 2006) (quoting United States v. Tennessee, 925 F. Supp. at 1303); Oantam Comms. Com. v. Star Broadcasting, Inc., 473 F.Supp.2d 1249 (S.D. Fla. 2007) (court must "balance the interest in sufficiently punishing and deterring the abusive conduct with the interest of allowing a full trial on the merits.").

In appropriate circumstances, courts can employ the "ultimate" sanctions of dismissal and default. NHL v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976) (default under Rule 37); Link v. Wabash R.R. Co., 370 U.S. 626 (1962) (dismissal). The harshest sanctions should be employed sparingly, after lesser sanctions have been considered and rejected, but the most severe sanction must be available as a penalty and deterrent. NHL, 427 U.S. at 643. See also Regional Refuse, 842 F.2d at 155 (ultimate sanction may be appropriate, even if lesser sanctions "might be

19

workable"). Ultimately, the type and severity of sanctions imposed is within the sound discretion of the Court. NHL, 427 U.S. at 642; Regional Refuse, 842 F.2d at 154; Pepoers, 873 F.2d at 968. In selecting an appropriate sanction, the Court considers the specific violation involved and the Defendants' prior conduct in this litigation. Regional Refuse, 842 F.2d at 150.

The Court's two prior orders imposed sanctions for noncompliance with the May 23, 2006 Order, including equitable tolling of the FLSA statute of limitations, an additional period for the acceptance of FLSA consent forms, corrective notice, and an award of substantial attorney's fees and costs. Despite the Court's specific findings on the inadequacy of previous efforts to ensure compliance with the May 23, 2006 Order, (Docket Entry No. 349, at p. 12), Defendants' response to the September 2008 Order was continued inaction without steps to avert further harm. The Defendants did not communicate to SFSI's managers that SFSI had been held in contempt and issue more effective instructions to ensure compliance with the protective order. The Defendants did not instruct their managers and supervisors in Mexico to stay away from the Court-ordered meetings with class members nor has SFSI disciplined any of its agents for their derisive statements about this action nor for violating the Court's Orders to protect class members from harm and to ensure the integrity of this class and collective action.

The Sixth Circuit has clearly enunciated the factors that a district court should consider in determining whether to impose the sanction of default or dismissal: whether to the failure to comply was based on inability (on the one had) or willfulness, bad faith, or fault (on the other); whether the adversary parity has been prejudiced; whether the sanctioned party was on notice that noncompliance could lead to an ultimate sanction; and whether lesser sanctions are appropriate. See Bank One v. Lowell, 916 F.2d 1067, 1079 (6th Cir. 1990) (applying Regional Refuse factors

20

to default); <u>Regional Refuse</u>, 842 F.2d at 154-155.

Considering the entire record, this Court concludes that the appropriate sanction for the Defendants' additional violations of the May 23rd Order and interference with the Court's remedy, is to bar the Defendants from submitting any proof to contest the Plaintiffs' proof of damages. In the Court's view, the Defendants' conduct was intended to limit the number of FSLA and AWPA plaintiffs and thereby to limit their financial exposure in this litigation. Absent default judgment on the merits of Plaintiffs' claims, the Court cannot discern any other effective sanction to protect the integrity of the class and collective action and the judicial process.

The Court again orders Defendants to circulate to all current nonsupervisory H-2B employees the Court-approved FLSA notice and opt-in form, in Spanish and English, using the payroll distribution system described by Haley Tester at the earlier hearing with another opt-in-period of 120 days from the issuance of this notice. The Court-approved notice shall be appended to a letter from class counsel setting forth in plain language the class claims, the right of potential FLSA class members to participate in the recovery and in the ongoing FLSA claims, the deadline for the submission of opt-in forms, and contact information for counsel. Each letter shall be accompanied by a postage-paid envelope for the return of opt-in forms to class counsel, for subsequent filing with the Court. As the parties at fault, Defendants are responsible for the costs of notice. <u>See also</u> <u>Veliz v. Cintas Corn.</u>, No. C 03-1 180 SBA, 2004 U.S. Dist. LEXIS 24871 (N.D. Cal. Nov. 12,2004); m,2 99 F. Supp. 2d 664 (E.D. Tex. 2003); <u>Bullock v. Automobile Club</u>, No. SA CV 01 -731-GLT(ANx), 2002 U.S. Dist. LEXIS 7692 (C.D. Cal. Jan. 28,2002); <u>Oldsmobile, Inc. v. GMC</u>, No. 99 Civ. 4567 (AGS), 2001 U.S. Dist. LEXIS 13893

21

(S.D.N.Y. Sep. 7, 2001); In re Federal Skywalk Cases, No. 81-0945-A-CV-W-S, 1982 U.S. Dist. LEXIS 10116 (W.D. Mo. Nov. 16, 1982). The Court orders Defendants to pay the costs of the attorney fees on this third motion and the costs of this additional notice.

Defendants contend that any misconduct did not involve the merits of the case (Docket Entry No. 458-1 at pp. 26-27) so as to preclude a default judgment on the merits, citing Phoceene Sous-Marine, S.A. v. Phosmarine, Inc., 682 F.2d 802 (9th Cir. 1982). With the chosen sanction, this issue is moot. In any event, the ability of class members to file claims, to offer testimony, and to cooperate with class counsel directly impacts the merits of this action. Potential class members cannot pursue claims under the FLSA unless they affirmatively file consent-to-sue forms. See 29 U.S.C. § 216(b). The Court has found that the Defendants have prevented such participation by threats of retaliation, persistent misstatements, and their recent interference with the Court ordered process. The purpose of civil contempt sanctions are, unequivocally, to coerce future compliance and to repair the harm that has been inflicted on the innocent parties and on the judicial process. See NHL, 427 U.S. at 643; Redken Labs, 843 F.2d at 299; see also Roadway Express, 447 U.S. at 764-65 (court must exercise contempt power "to protect the orderly administration of justice and to preserve the dignity of the tribunal").

For the above stated reasons, the Plaintiffs' third motion for contempt should be granted. Defendants are specifically warned that any further contumacious behavior will result in the ultimate sanction of default in this case.

An appropriate Order is filed herewith.

**ENTERED** this the _28th_ July, 2009.

William J. Haynes, Jr.
United States District Judge

22